# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | **Case No. 13-20876-TLM** |
| **DENNY A. RYERSON,** ) | |
| ) | **Chapter 11** |
| ) | |
| Debtor. ) | |
| _____ ) | |

## MEMORANDUM OF DECISION
_____

On August 30, 2013, Denny A. Ryerson ("Debtor"), filed a voluntary

petition commencing this chapter 11 case.[1]  On September 25, 2013, creditor

Anaconda, LLC ("Anaconda"), filed a motion for relief from the automatic stay of

§ 362(a).  Doc. No. 25 ("Motion").  The Motion requests relief from the automatic

stay to pursue a foreclosure sale of real property securing two notes (the

"Assigned Notes") Anaconda purchased from Idaho Independent Bank ("IIB").

The real property securing the Assigned Notes consists of two lots on Lake Coeur

d'Alene on which Debtor built a luxury home (the "Lake Estate"), and two

additional undeveloped lots adjacent to that property (the "Lots").  The Lake

_____

[1]  Unless otherwise indicated, all statutory citations in this Decision are to the provisions
of the Bankruptcy Code, Title 11, U.S. Code §§ 101–1532, and rule citations are to the Federal
Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 1

Estate and the Lots are collectively referred to as the "Property."

Pursuant to a prior agreement and order, a final hearing under § 362(e) was held on January 28 and 29, 2014.  The Motion was taken under advisement on February 5 upon the submission of written closing argument.  The Motion is resolved by this Decision, which constitutes the Court's findings and conclusions. Rules 7052, 9014.

**FACTS**

The testimony and documentary evidence presented at the final hearing establish the following.[2]

### A.    Debtor and IIB

Debtor is in his seventies and has had a long and in most regards successful career in developing real estate projects, particularly retirement housing.  He has seen four major negative economic cycles, including the most recent recession to which he attributes the bulk of his financial difficulties.

In 2003, Debtor commenced a banking relationship with IIB in the Coeur d'Alene, Idaho area.  Following a serious health issue, he moved to this area to construct his "dream home" on Lake Coeur d'Alene, which he planned to use as a

---

[2]  In reaching its findings of fact, the Court has considered the relevance of, and the weight to be given to, each witness' testimony.  Additionally, the Court takes judicial notice of its files and records, Fed. R. Evid. 201, in order to address matters of procedural background and the presence of certain filings.

vacation home or retreat before he eventually retired there.[3]  Debtor obtained a

line of credit with IIB, the amount of which steadily increased.[4]

Debtor used the funds from the line of credit to purchase two contiguous,

lakefront lots totaling 2.18 acres, which, along with the improvements Debtor built

on them, comprise the Lake Estate.[5]  Over a period of years, Debtor designed and

built three buildings on that land: 1) the primary residence—an approximately

11,000 square foot luxury custom home; 2) an approximately 1,500 square foot

residence, which is presently occupied by a year-round caretaker; and 3) a 900

square foot 3-car garage appurtenant to the primary residence with a 1,000 square

foot finished dwelling unit above it.  Debtor also purchased the Lots, which

comprise an additional 2.3 acres and buffer the Lake Estate from nearby

residences.[6]  IIB was aware of these expenditures as Debtor made them.

Debtor's obligations to IIB were restated in and evidenced by three

promissory notes executed in January 2011.  The notes were in the principal

---

[3]  Debtor and his non-debtor spouse live in Scottsdale, Arizona.  *See* Doc. No. 1 at 1;
Doc. No. 5 at 1; Doc. No. 20 at 14.  Venue in this District is apparently predicated on principal
place of assets, and has not been challenged.

[4]  Both Debtor and Dawn Smith, Special Assets Manager at IIB, testified to details of this
financial relationship, and about many of the dozens of exhibits introduced.  A summary of the
documents in the IIB loan files, and the history of lending, is found in exhibit 229 at internal
exhibit A.

[5]  Its address is 3562–3568 W. Lightning Tree Lane, Coeur d'Alene, ID.

[6]  The Lots are legally described as Lot 1 and Lot 2 of Block 2, Mica View Estates.

MEMORANDUM OF DECISION - 3

amounts of $4,777,951.95 (Loan No. ***0003), $1,791,543.24 (Loan No. ***1125), and $999,896.68 (Loan No. ***1771).  *See* Exs. 208, 209; Proof of Claim No. 3-1.  All the obligations Debtor owed to IIB were cross-collateralized.

These promissory notes all had a maturity of June 2012.  Debtor and IIB entered into a series of loan modifications starting in January 2012.  *See* Exs. 210–212.  The modifications are lengthy and detailed.  Debtor acknowledged  they were entered into by him, and are binding.

Debtor and IIB entered a "second amendment" to the initial loan modification in November 2012, Ex. 212, which established a maturity date of June 5, 2013.  Discussions occurred in 2013 about a further "third amendment," which contemplated both an extended maturity date and Debtor's execution of a deed in lieu of foreclosure on the Property in the event of a future default. Those discussions never resulted in an executed agreement.

During 2013, payments were made toward the outstanding note obligations through the application of proceeds of sales of properties.  These included $1,250,070.00 in October 2012, *see* Ex. 248 at Bates #IIB00373–374, and $1,443,825.86 received in March 2013, *see id.* at Bates #IIB00371–372.[7]

---

[7]  The obligations to IIB were owed by Debtor as "borrower."  Several Debtor-owned entities, including The Ryerson Company, LLC, and Turbo, LLC, were "guarantors."  To the extent the real properties liquidated for the purpose of paying toward Debtor's IIB obligations

(continued...)

MEMORANDUM OF DECISION - 4

Notwithstanding those payments, significant amounts remained due, and default was declared. IIB advised Debtor and his counsel it would pursue foreclosure of the Property, and notices of default were recorded in April and May 2013. Exs. 235, 236. Trustee's sale of the Property under the deeds of trust securing the Assigned Notes was scheduled for September 3, 2013. Debtor filed his petition for relief on August 30, staying such sale.

### B.   Dana Martin and Anaconda

Dana Martin, a California businessman, also owned real property on Lake Coeur d'Alene, though the residential structure thereon was destroyed by fire in 2012. He was aware of the Property which, as discussed below, was then listed by Debtor for sale. Mr. Martin was interested in and made offers to purchase the Lake Estate in July and October 2012. Neither offer generated a response. He later contacted IIB to discuss the possibility of acquiring IIB's secured debt position against the Property. He and his attorney, Robert Fasnacht, executed confidentiality agreements[8] and entered into such discussions with IIB.

---

[7] (...continued)
were owned by such entities, that distinction is immaterial for the purpose of the present Decision. Debtor acknowledged in testimony the application of these sales proceeds to the IIB debts. Ms. Smith testified that the allocation of proceeds to the various obligations, and to the components of such obligations, were made pursuant to the loan modification agreement, as amended, and specifically agreed to by IIB's counsel and Debtor's counsel.

[8]   *See* Exs. 100, 101. Ms. Smith testified that the dates shown on such agreements are
(continued...)

MEMORANDUM OF DECISION - 5

Anaconda was formed as a single-member limited liability company on July 24, 2013, with Mr. Martin as its sole member. Ex. 106. On August 1, 2013, Anaconda acquired IIB's interests in Loan No. ***0003 and Loan No. ***1125 (the aforementioned "Assigned Notes") and the security therefor, *see* Ex. 229 ("Assignment"). IIB retained Loan No. ***1771.[9] Anaconda paid $6,100,000 to IIB for the Assignment. Mr. Martin testified he intended to exercise credit bid rights under the Assigned Notes and related documents at the scheduled trustee's foreclosure sale to obtain the Property.

Anaconda filed a timely proof of claim in this bankruptcy case. Proof of Claim No. 4; *see also* Ex. 207 (the "Claim").[10] Anaconda's Claim, executed by its counsel, is in the amount of $8,788,687.26 as of the date of filing. Ms. Smith at IIB assisted Anaconda's counsel in calculating the amounts due under the Assigned Notes. *See* Exs. 246, 247. There has been no objection to the Claim, though Debtor has indicated in briefing that he will contest it through an objection or other litigation yet to be filed.

---

[8](...continued)
typographic errors. The actual date in 2013 when the agreements were signed is unclear.

[9] The Assignment reflects continuation of cross-collateralization under all the loan documents.

[10] The Claim, as filed in the Court's docket, contains multiple attachments. Many of those attachments are also exhibits. *See* Exs. 208–220, 246–247.

MEMORANDUM OF DECISION - 6

C.    **The Value of the Property**

The Lake Estate and Lots were the subject of an appraisal by Integra Realty

Resources ("IRR") for Anaconda with an effective date of August 30, 2013.  Ex.

206.  The IRR appraisal valued the Lake Estate at $7,910,000 and the Lots at

$365,000 and $260,000.  Therefore, Anaconda asserts the value of the Property is

$8,535,000.

Jack Cochran of IRR credibly explained the methodology and analysis

employed in reaching those values, but a few areas were appropriately challenged

during cross-examination.  Among the more plausible attacks was Mr. Cochran's

inability to locate and utilize information about additional comparable properties,

both on Lake Coeur d'Alene and on other, similar lakes in the Pacific Northwest.

Debtor presented no valuation evidence through appraisal.  Debtor's

Realtor, Greg Rowley, was led by Debtor's counsel through a detailed description

of many of the exceptional features of the Property.[11]  Though these features are

individually and collectively impressive, and no doubt were incurred at significant

cost, this testimony did not provide the Court with any precise alternative value

for the Property, and none was suggested.  And Mr. Cochran had previously

---

[11]  Many of these features were identified by Mr. Cochran as well.  *See* Ex. 206 at
Addendum B.

MEMORANDUM OF DECISION - 7

acknowledged the unique and exceptional character of the Property in his appraisal and testimony. To the extent Debtor sought to attack the IRR appraisal for failure to adequately consider these features, the Court discounts those arguments.

Debtor valued the Property in his schedules at $10,500,000. This is the same amount as the listing price on the Property since June 2012. Debtor's proposed chapter 11 disclosure statement values the Property at "$9 million plus." Doc. No. 87 at 15.

While listed, the Property drew only four offers or expressions of serious interest. Two of those offers were from Mr. Martin. Both excluded the Lots. One was for $5,000,000 (Lake Estate only), and the other for $6,000,000 (Lake Estate and personal property therein). *See* Exs. 238 and 237 respectively. Debtor responded to neither offer. A party named Vaughn also made an offer, without earnest money, but the amount of that offer was not discussed. And, according to Mr. Rowley, there is a current "interested offeror" who intends to make an "opening" offer of $7,500,000.[12]

During their testimony, Debtor and Mr. Rowley both acknowledged they agreed the asking price would be lowered to $9,500,000, given the amount of

---

[12] Whether this last "interest" at $7,500,000 included the Lots was unclear.

MEMORANDUM OF DECISION - 8

these prior offers, the lack of other offers during the past 20 months, and the present state of the market.

The often inexact science of valuing property is compounded when the property at issue is a specially-designed and constructed luxury home of this sort. There are no directly "comparable" properties on the Lake, and there is only so far one can credibly go in comparing and contrasting view, style, size and amenities of properties in the area. And while many of the features and amenities of the Property may have cost Debtor handsomely, whether a buyer would attribute the same inherent value to them, and adjust his or her offer accordingly, was a proposition far from established by the testimony.[13]

On the lower end of the scale, the Court gives less weight to the two initial offers made by Mr. Martin and to the undisclosed "interested offeror." And on the upper end, it also gives less weight to the $10,500,000 listing price and initial scheduled value.

Mr. Cochran's appraisal (aggregating $8,535,000 for the Lake Estate and the Lots together) was generally sound and well defended during his testimony, although the Court recognizes certain aspects of the critique advanced during cross-examination could support a marginally higher estimated value. However,

---

[13]    The witnesses all effectively agreed that the pool of potential buyers for a property of this sort was quite small, and that marketing would be at least national and perhaps international in nature. Mr. Rowley also testified that, at this high-end niche of the luxury, second or third-home, real estate market, most buyers paid cash.

MEMORANDUM OF DECISION - 9

Debtor's decision to lower his asking price from $10,500,000 to $9,500,000 is also a relevant factor. The Court gives this decision to lower the asking price some weight.

In considering all the evidence, the Court finds that, for the purposes of this Motion,[14] the value of the Property, including fixtures but excluding moveable personal property, is $9,000,000.

## DISCUSSION AND DISPOSITION

### A.    Section 362(d)(1)

The Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under [§ 362(a)] . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" § 362(d)(1). Anaconda argues in its closing brief that Debtor has not provided adequate protection to Anaconda because he has made no payments since Anaconda acquired the Assigned Notes, and has failed to pay taxes on the Property. *See* Doc. No. 101 at 1–2.

But Anaconda failed to request such relief in the Motion. Although Anaconda states it pleaded for relief under § 362(d)(1) in ¶ 9 of the Motion, *see* Doc. No. 101 at 2, the Court's inspection of that paragraph reveals only oblique

---

[14]    *See* § 506(a) ("Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on the disposition or use or on a plan affecting such creditor's interest.")

MEMORANDUM OF DECISION - 10

factual allegations about Debtor's failure to make payments during the pendency of the case.  Anaconda never argued in the Motion that § 362(d)(1) applied, instead, it specifically alleged it was entitled to relief under § 362(d)(2).[15]

While Anaconda's Motion pleaded facts that could support relief under § 362(d)(1), nothing in the Motion or the supporting brief, Doc. No. 78, put Debtor on notice that Anaconda was seeking relief under that provision.  *See* Bankruptcy Rule 9013 ("The motion shall state with particularity the grounds therefor, and shall set forth the relief or order sought."); *In re White*, 409 B.R. 491, 495–96 (Bankr. N.D. Ind. 2009) (denying motion for relief from automatic stay for failure to state the grounds with particularity).  It would be unfair to allow Anaconda to seek § 362(d)(1) relief by first asserting it in a closing brief.[16]  Thus, to the extent Anaconda seeks relief under § 362(d)(1), the Motion will be denied.

### B.    Section 362(d)(2)

The Code also provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under [§ 362(a)] . . . (2) with respect to a stay of an act against property under [§ 362(a)], if—(A) the debtor does not have an equity in such property; and (B) such property

---

[15] Anaconda also failed to mention § 362(d)(1) in its opening brief, Doc. No. 78.

[16] While evidence on Anaconda's claim and on the value of the Property lends itself to an analysis of § 362(d)(1) issues, the Court does not conclude that these issues were tried by consent.

MEMORANDUM OF DECISION - 11

is not necessary to an effective reorganization." *See* § 362(d)(2).  The Motion

before the Court expressly seeks relief under § 362(d)(2).

The party requesting stay relief, Anaconda, has the burden of proof on the

issue of equity.  *See* § 362(g)(1).  Debtor, as the party opposing such relief, has the

burden on all other issues.  *See* § 362(g)(2).

### 1.    Equity

Equity, for purposes of § 362(d), exists if there is value in property in

excess of all the claims secured by that property.  *In re Jordan*, 392 B.R. 428, 447

(Bankr. D. Idaho 2008) (citing *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396,

1400 n.2 (9th Cir. 1984) (holding that equity is "the value, above all secured

claims against the property, that can be realized from the sale of the property for

the benefit of the unsecured creditors").

### a.    Anaconda's secured claim

As noted, Anaconda filed the Claim, Ex. 207, in the amount of

$8,788,687.26.  Although Debtor has not objected to the Claim, Debtor attacked it

in two ways during these proceedings.  First, Debtor questioned the validity of the

amount of the claim.  Second, Debtor asserted that, by operation of the Idaho

Collection Agency Act ("ICAA"), Idaho Code § 26-2221 *et seq.*, Anaconda could

MEMORANDUM OF DECISION - 12

not collect on the Assigned Notes.[17]

### i.    Amount of secured claim

There has been no objection to Anaconda's $8,788,687.26 claim, and it is therefore allowed.  *See* §§ 501, 502; *see also In re Root*, 12.4 IBCR 120, 123, 2012 WL 5193840, *5 (Bankr. D. Idaho Oct. 19, 2012) (requiring chapter 11 debtor to treat claim in plan when no objection to the proof of claim was filed).[18] Additionally, under Rule 3001(f), "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

While not filed as a formal objection to claim, the nature of Debtor's objections to the amount of the Claim in the context of the stay relief hearing take several forms.  For example, Debtor appears to challenge the calculations by which the amounts of certain of the Claim's components were reached.  However, Ms. Smith testified as to the preparation of the calculations she provided Anaconda's counsel for use in the Claim, and her testimony and figures were not impeached.  Additionally, Debtor conceded during his testimony that the

---

[17] Debtor also, in argument and in his disclosure statement and Plan, indicated an intention to sue Anaconda, Martin and IIB regarding the acquisition of the Assigned Notes, and to "offset" any recovery against amounts that might be found owing to Anaconda.  The Court need not address such contentions for the purposes of this Decision.

[18] The Court also notes that § 506(b) allows an oversecured creditor post-petition interest on the claim as well as reasonable fees, costs or charges provided for under its agreement with the debtor.

MEMORANDUM OF DECISION - 13

allocation of payments made to IIB toward the outstanding debt, which Ms. Smith

explained were applied to unpaid principal and non-default interest, were agreed

to by Debtor and IIB.

Debtor also signaled a nascent argument about default interest accrued or

late fees and expenses charged.  However, Debtor verified the several agreements

he entered into with IIB and acknowledged they were binding.  And no objections

on this, or other grounds, have yet been filed to the Claim.

Further, even if the Court were to entertain these arguments without an

objection to the Claim, Debtor has not addressed the relevant case law.  For

example, the Ninth Circuit, relying on *Travelers Casualty & Surety Co. of*

*America v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007), has said "the default

rate should be enforced, subject only to the substantive law governing the loan

agreement, unless a provision of the Bankruptcy Code provides otherwise."  *Gen.*

*Elec. Capital Corp. v. Future Media Prods. Inc.*, 536 F.3d 969, 973 (9th Cir.

2008).  Indeed, a bankruptcy court should "apply a presumption of allowability for

the contracted default rate, 'provided that the rate is not unenforceable under

applicable nonbankruptcy law.'"  *Id.* at 974.  Here, Debtor has failed to

substantiate that any provision of the Code applies at this stage to reduce the

Claim, or raise any reason the default interest rate could not be enforced under

MEMORANDUM OF DECISION - 14

non-bankruptcy law.[19]

The Court concludes these various contentions, yet to be properly raised, do not vary the operation of § 502 or Rule 3001(f). The amount of the Claim at the petition date, for the purpose of this Decision, is $8,788,678.26.

### ii.      Idaho Collection Agency Act

Debtor also argues Anaconda is subject to the ICAA. The Court need not reach this issue at this time.

Stay relief proceedings are summary in nature and limited to determining whether there are "sufficient countervailing equities to release an individual creditor from the collective stay." *Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)*, 450 B.R. 897, 913–14 (9th Cir. BAP 2011). Thus, a relief from stay proceeding is not an appropriate vehicle for finally and definitively determining a creditor's claim or security. *Id.* (citing *Johnson v. Righetti (In re Johnson)*, 756 F.2d 738, 740 (9th Cir. 1985)) ("Hearings on relief from the automatic stay are thus handled in a summary fashion. The validity of the claim or contract underlying the claim is not litigated during the hearing."). The BAP in *Veal* further held that a "colorable" claim exists if the movant owns or has an interest in

---

[19]   Debtor at one point testified that his execution of the last of the modification agreements (referring to Ex. 211) was made under "duress." This appears inconsistent with Ms. Smith's testimony that the allocations of amounts received *after* Ex. 211 were negotiated and agreed on by the parties' counsel. Nor did Debtor address authorities on the theory of economic duress such as *St. Alphonsus Regional Med. Ctr., Inc. v. Krueger*, 861 P.2d 71, 76–77 (Idaho App. 1992).

a note secured by the debtor's or estate's property, or is a person entitled to enforce such a note under applicable state law. *Id.* at 910; *see also McKenna v. PNC Bank, N.A. (In re McKenna)*, 2013 WL 2321960, *3 (9th Cir. BAP May 28, 2013) (determining creditor had a colorable claim when it established it was the successor in interest to the original creditor).

As the Ninth Circuit has recognized, "Given the limited nature of the relief obtained through this [stay relief] proceeding and because final adjudication of the the parties' rights and liabilities is yet to occur, a party seeking stay relief need only establish that it has a colorable claim to the property at issue." *Arkison v. Griffin (In re Griffin)*, 719 F.3d 1126, 1128 (9th Cir. 2013) (citing *Veal*, 450 B.R. at 914–15).

Anaconda has established a colorable claim. Debtor argues the claim might ultimately be proven to be uncollectible by Anaconda given the ICAA. In this sense, he is similar to the mortgagor who contends that the putatively valid mortgage has a flaw that the mortgagee (or the mortgagee's assignee) must overcome. Those issues are not heard in the context of stay relief, but in other contexts and, perhaps, by other courts.

### iii.    Section 506(b)

Anaconda's Claim at filing ($8,788,678.26) is oversecured by the Property ($9,000,000.00). Thus Anaconda is entitled to allowed post-petition interest. *See*

MEMORANDUM OF DECISION - 16

§ 506(b).[20]  According to the Court's calculations, based on the per diem interest

rates for Anaconda's Claim,[21] post-petition interest on the Claim accrued from the

petition date to the date of this Decision has exhausted any equity cushion

Anaconda had in the Property.[22]  But even without considering Anaconda's

§ 506(b) post-petition interest, Debtor has no equity in the Property because of the

presence of other secured claims.  *Mellor*, 734 F.3d at 1400 n.2.

### b.    Other secured claims

Debtor acknowledges the existence of three other claims secured by the

Property.  These include:

> 1) $51,898.00 of real property taxes owed to Kootenai County, *see*
> Doc. No. 20 at 15–16 ("Schedule D") and § 1111(a);
>
> 2) $935,102.00 deed of trust owed to David Lane, *see* Schedule D
> and § 1111(a);
>
> 3) $476,080.03 judgment lien owed to Jed Billings, *see* Proof of

---

[20] This section also allows reasonable costs and fees to the oversecured creditor.  For the purposes of this Decision, the Court's references to and discussion of § 506(b) focuses only on the interest component.

[21] The per diem interest rates are found in Exs. 246, 247.  Debtor did not present evidence or otherwise challenge the calculations in that exhibit.

[22] Equity cushion is defined as "the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss . . . during the time the automatic stay remains in effect." *Mellor*, 734 F.2d at 1400 n.2.  Here, the equity cushion is the value of the Property over the subject secured debt of Anaconda and of the Kootenai County taxes senior to Anaconda.  Although equity cushion is typically determined when analyzing adequate protection in the context of § 362(d)(1), the concept is also relevant in this § 362(d)(2) analysis because the lack of equity cushion necessarily establishes Debtor lacks equity in the Property.

MEMORANDUM OF DECISION - 17

Claim No. 5-1; *see also* Ex. 242 (stipulated judgment).

*See also* Doc. No. 87 at 13, 17–19 (disclosure statement).  Debtor has not

indicated any intent to contest any of these three claims.  *Id.*

The claims of Kootenai County, Mr. Lane and Mr. Billings total

$1,463,080.03.  For the purpose of this Decision, the Court determined

Anaconda's Claim was $8,788,687.26 as of the petition date.  When the claims of

Kootenai County, Mr. Lane and Mr. Billings are added to Anaconda's Claim, they

total $10,251,767.29—well over the $9,000,000 value of the Property.  As a

result, Debtor lacks equity in the Property, and § 362(d)(2)(A) is satisfied.

### 2.      Necessity for an effective reorganization

After the party seeking relief under § 362(d)(2) establishes the debtor lacks

equity in the property, the burden is on the debtor to establish the property is

necessary for an effective reorganization.  *United Sav. Ass'n of Tex. v. Timbers of*

*Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988).  To satisfy

§ 362(d)(2)(B), a debtor must show both a "reasonable possibility of a successful

reorganization within a reasonable time" and "if there is conceivably to be an

effective reorganization, this property will be needed for it[.]"  *Id.* (internal

quotation marks omitted) (citation omitted).

According to the Ninth Circuit Bankruptcy Appellate Panel, "[w]hile it is

true that a relief from the stay hearing should not be converted into a confirmation

MEMORANDUM OF DECISION - 18

hearing, 'the effective reorganization requirement enunciated by the Supreme

Court . . . require[s] a showing by a debtor . . . that a proposed or contemplated

plan is not patently unconfirmable and has a realistic chance of being confirmed."

*Sun Valley Newspapers, Inc. v. Sun World Corp. (In re Sun Valley Newspapers,*

*Inc.)*, 171 B.R. 71, 75 (9th Cir. BAP 1994) (quoting *John Hancock Mut. Life Ins.*

*v. Route 37 Bus. Park Assoc.*, 987 F.2d 154, 157 (3d Cir.1993)) (alterations in the

original).  But the *Sun Valley Newspapers* panel also noted that the effective

reorganization showing "is a 'moving target which is more difficult to attain as the

Chapter 11 case progresses.'" *Id.* (quoting *Sumitomo Trust & Banking Co. v.*

*Holly's, Inc. (In re Holly's Inc.)*, 140 B.R. 643, 700 (Bankr. W.D. Mich.1992));

*see also Timbers of Inwood Forest Assocs.*, 484 U.S. at 376 (noting "bankruptcy

courts demand less detailed showings during the four months in which the debtor

is given the exclusive right to put together a plan").  The *Sun Valley Newspapers*

panel noted the debtor's burden increases from showing a successful

reorganization is "plausible" early in the case, to showing reorganization is

"probable" near the expiration of the exclusivity period, and finally to showing

reorganization is "assured" after the exclusivity period expires.  *Id*. at 75.

    The exclusivity period had run by the time the Court heard the Motion, *see*

§ 1121 (setting a 120-day exclusivity period unless the court orders otherwise),

but the Motion itself was filed a mere twenty-six days after Debtor filed the

petition.  The Court need not determine which standard should apply, because

MEMORANDUM OF DECISION - 19

even under the lighter "reorganization is plausible" standard, Debtor does not prevail.

Debtor filed the Plan on January 20, 2014, nine days before the hearing on the Motion. Among other things, the Plan proposes Kootenai County will be paid in full within 90 days of confirmation from the proceeds of sale of the Property. *See* Doc. No. 88 at 16. The Plan contemplates Debtor objecting to Anaconda's claim (and pursuing other litigation against Anaconda), but any allowed portion of Anaconda's claim will be paid in full by the sale of the Property. *Id.* at 17–18. The Plan also proposes Mr. Lane will be paid from any available proceeds of sale of the Property, and from the proceeds of sale from other property (*i.e.* Gozzer Ranch Lot 203) securing his deed of trust. *See id.* at 21–22. The Disclosure Statement and Plan do not anticipate or project that the Property will bring in value in excess of the Assigned Notes, the real property taxes, and the Lane deed of trust. Those documents indicate the Billings judgment—junior to these secured interests—will be "released" and such creditor satisfied from other assets. *Id.*

Ultimately, though, the Plan proposes—and Debtor repeatedly stressed at the hearing—that any sale of the Property will occur by May 31, 2014. According to the Plan and Debtor's assertions, Debtor would agree to lift the automatic stay effective June 1.

The utility of the Property to Debtor is in realizing as much value from it as the market will allow during the spring 2014 selling season, and retiring as much

MEMORANDUM OF DECISION - 20

secured debt as possible. It is clear that the Lake Estate—despite its characterization as Debtor's "dream house"—is not going to be retained by Debtor. Debtor hopes to sell it and maximize the proceeds to satisfy secured debt.

As presented through the filed Plan and at the hearing on the Motion, the Court concludes that confirmation of the Plan as structured is implausible. Without pre-litigating confirmation of the Plan, the Court notes that several problems must be addressed.

First, the Plan fails to address § 363(k), or credit-bidding generally, on the contemplated sale of the Property. Pursuant to *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065 (2012), a chapter 11 plan cannot be confirmed if it proposes sale of estate property free and clear of liens unless it also allows for credit-bidding. *Id.* at 2072. Here, the Plan contemplates selling the Property free and clear of the various liens that are currently attached to it, but fails to make any mention of credit-bidding.[23]

Second, the Plan fails to address the logistics of payment of claims with funds from sale of the Property while simultaneously attempting to reserve Debtor's ability to later attack Anaconda's Claim. Without a final determination of Anaconda's Claim or reservation of adequate sales proceeds to protect Anaconda, Debtor will not be able to pay the junior lienholder, Mr. Lane, as the

---

[23] While a pre-confirmation sale also implicates § 363(k) issues, the Court here focuses on the Plan given § 362(d)(2)(B) authorities.

MEMORANDUM OF DECISION - 21

Plan contemplates, because he will not know how much money he will have available to pay Mr. Lane.

While the theory of the Plan is clear, the details are vague and do not adequately address the confirmation standards that will apply. Given the guidance of *Sun Valley Newspapers*, these are critical § 362(d)(2)(B) considerations.

In another case, where a debtor opposed stay relief, arguing it needed to retain the property to help satisfy junior lienholders if it were to successfully reorganize, the bankruptcy court acknowledged that even partially satisfying junior lienholders through the property would ease the difficulty of the debtor's reorganization. *La Jolla Mortg. Fund v. Rancho El Cajon Assocs.*, 18 B.R. 283, 291 (Bankr. S.D. Cal. 1982). But the court ultimately decided to lift the stay:

> The problem with the debtor's argument in this case is the complete failure of the debtor to present evidence that would support the finding that reorganization is likely and to explain how the minimal value in this property could be useful here in the reorganization. It does not appear, even under the most optimum circumstances, that this property could produce any significant reduction in any [junior lienholder] claim.

*Id.*

Debtor, like the debtor in *La Jolla Mortgage Fund*, has failed to establish that junior lienholders are likely to benefit from continuation of the stay with regard to the Property. Based on the value the Court has found for the Property, Anaconda's post-petition interest under § 506(b) has usurped any possible value that might have otherwise gone to the junior lienholders. Even if Debtor were to

MEMORANDUM OF DECISION - 22

sell the Property at $9,000,000 before June 1, 2014, the junior lienholders would receive nothing.

All parties agree at least the first $51,898.00 must pay the real property taxes owed to Kootenai County.  The next $8,788,687.26 is subject to Anaconda's Claim as of the petition date.[24]  And the Court's calculations, based on the per diem interest rates in the evidence, establish that the remaining value is being eaten up by Anaconda's § 506(b) post-petition interest, which will continue to accrue as long as the Property has value over Anaconda's claim.   Debtor premises his "successful reorganization" arguments on generating value from the Property for creditors other than Anaconda, but the evidence establishes that possibility is very unlikely.

Further, even if the next junior lienholder (Lane) were to receive *some* funds from the sale of the Property, the Ninth Circuit has recognized that such a potential does not justify refusing to lift the stay.  "Refusing to grant relief from the automatic stay under those circumstances would only promote the junior lienholders' interests over those of the senior lienholder."  *Stewart v. Gurley*, 745 F.2d 1194, 1196 (1984) (per curiam).

For the foregoing reasons, the Property is not shown to be necessary to

---

[24] For the purposes of this discussion, the Court again notes the absence of an objection to the Claim, much less any pending adjudication of the Claim, and the failure of Debtor to explain how a pre-plan or post-plan sale will deal with Anaconda's credit bid and other rights.

MEMORANDUM OF DECISION - 23

Debtor's reorganization.[25]

**CONCLUSION**

Anaconda has carried its burden under § 362(g)(1).  There is no "equity" in the Property.  Debtor has not carried his burden under § 362(g)(2) of showing the Property is necessary in his attempts to effectively reorganize.  Both prongs of § 362(d)(2) have been satisfied on this record, and the stay of § 362(a) shall be terminated as to Anaconda and the Property.

Anaconda's Motion for Stay Relief, Doc. No. 25, will be granted.  Counsel for Anaconda shall submit a form of order.

DATED:  February 18, 2014



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[25]  In addition to the problems noted, Debtor would also need to address other issues in order to confirm the Plan. For example, Debtor will have to establish that both he and the Plan "compl[y] with the applicable provisions" of the Code. § 1129(a)(1)–(2). Debtor's testimony at the hearing raised questions about both the sufficiency of the monthly operating reports ("MOR") he has filed, and his failure to file Rule 2015.3 reports for the entities, presumptively reportable under Rule 2015.3(c), shown in the addendum to his schedule B, Doc. No. 20 at 11–13.  *See In re Hoyle*, 2013 WL 210254 (Bankr. D. Idaho Jan. 17, 2013).  The first of those reports was due seven days before the 341(a) meeting on September 27, 2013, but has not been filed.  The next report is due March 27.  Additionally, Debtor's testimony about sales of related entities' assets and funneling money into the bankruptcy estate heightens the issue of adequacy of MORs and the failure to file Rule 2015.3 reports.

MEMORANDUM OF DECISION - 24