# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

|                              |   |                          |
|------------------------------|---|--------------------------|
| IN RE                        | ) |                          |
|                              | ) | **Case No. 13-20876-TLM** |
| **DENNY A. RYERSON,**        | ) |                          |
|                              | ) | **Chapter 11**           |
| **Debtor.**                  | ) |                          |
| _____ | ) |                          |

## MEMORANDUM OF DECISION
_____

Before the Court is a "Request for Adequate Protection," Doc. No. 127 ("Request"), filed by creditor Anaconda, LLC ("Anaconda"). Anaconda is a single member LLC. The initial member at the time of prior hearings was Dana Martin ("Martin").[1] The chapter 11 debtor in possession[2] Denny Ryerson ("Debtor") opposes Anaconda's Request on several bases.

Anaconda's Request came on for hearing on August 4 and again on September 2, 2014. Both Ryerson and Anaconda appeared at hearing through counsel. Following the close of evidence and oral argument on September 2, the Request was taken under advisement. This Decision constitutes the Court's findings of fact and conclusions of law on this contested matter. Rules 7052,

---

[1] Testimony suggested Anaconda's single member may now be a Martin-related family trust. That change, if it occurred, was not shown to be relevant to the Request.

[2] Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure.

MEMORANDUM OF DECISION - 1

9014.

## I.    BACKGROUND AND FACTS

### A.    Procedural context

Debtor filed the petition commencing his chapter 11 case on August 30, 2013. Anaconda obtained relief from stay in order to foreclose upon certain real property and improvements securing two notes. Anaconda acquired the notes, and the deeds of trust securing the same, by assignment from Idaho Independent Bank. *See* Doc. No. 103 (Memorandum of Decision).[3]

The property securing the notes is located on the shore of Lake Coeur d'Alene. A residence and related structures sit on two contiguous lakefront lots,[4] and there are two additional lots adjacent thereto.[5] The Court in its Decision valued the lots and residence, including improvements but excluding moveable personal property (*i.e.*, extensive furniture and art) at $9,000,000. *Id.*

After the Court lifted the automatic stay, Anaconda commenced foreclosure on the deeds of trust. On April 14, 2014, for a credit bid of $7,000,000, Anaconda obtained the property on which the residence is located. At a separate foreclosure

---

[3]  The Decision, which supported the order granting Anaconda's § 362(d)(2) motion, Doc. No. 104, is fully incorporated by reference. Additionally, consistent with the parties' request, the Court has considered certain of the exhibits introduced in the stay relief litigation.

[4]  The two primary lots total 2.18 acres. The residence, a luxury custom home, is about 11,000 square feet in size. There is a separate 1,500 square foot caretaker residence and a separate 900 square foot garage with a dwelling unit over it.

[5]  The adjacent lots comprise another 2.3 acres and are used to buffer the estate from nearby development.

MEMORANDUM OF DECISION - 2

sale on April 15, Anaconda obtained the two adjacent lots for a credit bid of $145,000.

Immediately following foreclosure, Martin inspected the property. Martin acknowledged Debtor was entitled to remove personal property such as furniture and art, but from his inspection believed certain "fixtures" were improperly removed. Anaconda's Request was filed ten days after the foreclosure.

### 1.    The Request

The Request claims Debtor "stripped" over $550,000 worth of "fixtures" from the property. Doc. No. 127 at 2. It generally describes the same as "[w]ith limited exception, all light fixtures, bath mirrors, a large dock, built-in appliances, built-in outdoor appliances, built-in stereo components, cabinets, back-up power supply generators (3), statuary, custom window coverings, [and] plumbing fixtures." *Id.*

The Request expressly relied on an April 18, 2014 letter from Gerrold ("Jerry") Flowers dba Flowers Construction. *See* Ex. 252.[6] That letter more specifically itemizes the alleged fixtures at issue. The items set out in Ex. 252 are:

(1) <u>Lighting fixtures</u>.   (Main house: 192 recessed can lights; main dining room chandelier; circle staircase chandelier; 43 ceiling mounted lights and hanging lights; 42 wall sconce lights; over-cabinet, under-

---

[6] The letter was filed as Doc. No. 128-1, and a copy was admitted as Exhibit 252. References herein will be to the exhibit. The letter was attached to an affidavit of Flowers, Doc. No. 128 (Ex. 144), which affidavit was largely redundant of the letter. The Court declines to consider the testimony offered in the affidavit and instead considers and weighs Flowers' testimony at hearing. *See* Rule 9014(d).

MEMORANDUM OF DECISION - 3

cabinet and indirect lighting in 14 locations.  Guest house: 21 recessed can lights; 5 ceiling mounted and hanging lights; 8 wall sconce lights; 2 fan trim.  Caretaker house: 19 recessed can lights; 7 ceiling mounted lights; 5 wall sconce lights. Grounds: 8 post and column lights.)

(2)   <u>Appliances</u>.  (Main house: a 65" French-made gas range;[7] "built-in"[8] microwave oven; "built-in" convection oven; "built-in" espresso maker;[9] "built-in" Sub Zero freezer; washer and dryer in laundry; 4 pairs of stacking washers and dryers in bedrooms; "built-in" vacuum system, hoses and attachments.  Guest house: gas range and oven; microwave hood and oven; stacking washer and dryer.  Caretaker house: electric range and oven; refrigerator; built-in microwave oven; stacking washer and dryer.)

(3)   "Attached" TV, sound system and "all electronics"

(4)   <u>Standby generators</u>.  (Main house: 150 KW propane generator. Pump house: 20 KW propane generator.  Caretaker house: 20 KW propane generator).

(5)   <u>Plumbing fixture</u>.  (Main house: Powder room pedestal sink).

(6)   <u>Window coverings</u>.  (All window coverings and rods from main house, guest house and caretaker house).

(7)   <u>Garage doors and gate remotes</u>.  (5 remote control units).

(8)   <u>Large boat dock</u>.

(9)   <u>Statues</u>.  (Grounds: 2 large bronzes (Indians), 1 full-sized moose,

---

[7]  Other evidence established this is a "La Cornue" gas and electric range.

[8]  The term "built-in" as used in this summary comes directly from the Exhibit and is Flowers' characterization.  The adjective is included here solely to clarify what Anaconda asserts and is not determinative.

[9]  The evidence reflects that these last three items are made by "Miele" and there were also additional Miele items including "warming drawers."  *See also* Doc. No. 174-1 at 16 (identifying certain items in dispute including Miele appliances).

MEMORANDUM OF DECISION - 4

and 1 carved wood eagle.[10]

Anaconda's Request asserts that these removed items all constituted "fixtures" of the real estate and were rightly subject to Anaconda's deed of trust.[11] Anaconda demands "adequate protection" in the form of (a) return of the claimed fixtures along with payment by Debtor of the cost of reinstallation, (b) payment of the cash value of any such fixtures that have been sold or transferred, and (c) a replacement lien on other property of the estate to secure the value of transferred property and the costs of reinstallation.

Debtor opposes Anaconda's Request.[12]  Debtor argues that none of the removed property constituted a fixture and thus was not within the security interest created by the deeds of trust and there was no separate agreement collateralizing

---

[10]  Flowers also ascribed "values" to all these items by category.  The Court does not recite the same here since the asserted values, even if credible, have nothing to do with the legal issue of characterization of the items as fixtures or as removable personal property.  In addition, testimony established that Flowers' figures were not based on viewing and evaluating those items but, rather, were in the nature of an "allowance" that he would allow a homeowner were he bidding a job.  Little if any weight would be given to these figures, were they to be relevant to the issues.

[11]  Anaconda relies on language in the deeds of trust transferring to the deed of trust trustee "all of Grantor's right, title and interest in and to the . . . described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures[.]"  Exs. 213, 214.

[12]  Debtor also objected to the form in which relief was sought, contending that "adequate protection" under § 361 (or otherwise) was inapt, and that determination of the nature or extent of the parties' interests in the disputed property required an adversary proceeding under Rule 7001. But in pre-hearing briefing, Debtor consented to using the Request and the evidentiary hearing thereon as a vehicle to resolve the dispute.  Doc. No. 190 at 3.

MEMORANDUM OF DECISION - 5

such property to the benefit of Anaconda.[13]

### 2.    The removal of the items

### a.    Concealment

Testimony established that, as the foreclosure date loomed, Debtor and his

wife caused movers, electricians and other professionals to assist in removing what

Debtor deemed to be personal property not subject to Anaconda's interest in the

land, residence and related structures/improvements, and fixtures.  Debtor was not

present through much of this process, and his wife coordinated much of the

activity.[14]

Anaconda noted that windows on the property were covered with sheets,

cardboard or other materials and asserted this was evidence of an intent to

"conceal" Debtor's activity inside the residence including the so-called "stripping"

of the property.  Debtor's testimony indicated the windows were covered at a later

stage of the move-out process and only after Debtor's wife, and women from the

area assisting her in packing personal property, discovered people on adjacent

roads attempting to observe or monitor them.[15]  Though the precise details

---

[13] Debtor intends to sell the non-fixture personal property and devote the proceeds to payment of creditors under the chapter 11 plan.

[14] Despite Debtor's lack of direct personal knowledge, no objections were raised to Debtor's testimony.  However, the Court considers its weight in light of the admission that much was second-hand information.

[15] Debtor was also not present during these events, but testified that, upon his wife's inquiry, he instructed her to cover the windows.

MEMORANDUM OF DECISION - 6

surrounding the covering of the windows is unclear, Anaconda's argument that the

actions were indicative of purposeful concealment of improper activity was not

proven.  And these events, however characterized, were of little relevance to the

fundamental issue of whether items were fixtures or moveable personal property.

### b.    Intent and damage

Additionally, Anaconda argued that the manner in which the personal

property was removed was indicative of malicious intent.  Though such a motive

or intent was not shown to be particularly material to the legal issues presented

under the Request, Anaconda repeatedly asserted that Debtor or those hired by him

caused damage to the residence and adjacent improvements during the removal

process.[16]  Anaconda contended that walls and ceilings were damaged during the

removal of lighting, audio/visual ("A/V") equipment, and appliances.  Martin

testified the wiring was "butchered" rather than disconnected.  And the testimony

of Anaconda's witness, Lance Haynie, described the A/V equipment that he had

initially installed as being removed by improper or unprofessional means,

including cutting or slashing of wires, leaving a destroyed area and unusable

connections.  Anaconda claims a substantial cost will be incurred to remediate that

---

[16]  Though intent is not shown to be relevant, damage to the property (as opposed to
damage to the removed item) may be.  *See, e.g.*, *Rayl v. Shull Enters.*, 700 P.2d 567, 571–72
(Idaho 1985).

MEMORANDUM OF DECISION - 7

damage.[17]

Other testimony, however, is directly contradictory.  Michael Hodan of

Premier Electric is an electrician who was directly involved in the removal.  He

credibly testified that when the lighting was removed, it was professionally and

carefully uninstalled and the wiring involved was cut and capped (*i.e.*, he would

"safe it off") in order that future lighting fixtures could easily be reinstalled and

there would be no electrical risk in the interim to individuals or the structure due to

unsafe or exposed wiring.  He expressly testified there was no demolition and no

damage.  Indeed, Anaconda's own witness, Flowers, testified that most of the light

fixtures were removed in a professional manner, the wiring nuts were put back on

and the wires were "shoved in."

Eric Schoutens, the original subcontractor who had installed the "low

voltage" aspects of Debtor's audio/visual, security system, and related electrical

components and systems, was also retained by Debtor to assist in the removal of

such equipment.  He testified he had powered down the surveillance system,

disconnected the A/V rack, unplugged the same from the related wall plates and

stored the cabling in the rack.  He stated there was no damage to the walls or racks,

---

[17]  The extent of that alleged cost was not proven.  Flowers "estimate" of repair costs was
not well corroborated, and was rendered questionable given its being a "bid" or "allowance"
reflecting what he would estimate for the purchase and installation of lighting (etc.) were he to
bid a contract to provide the same.  Other evidence was extremely limited.  The Court addresses
in Part II, *infra*, an approach to establishing the cost of remediation for improper removal of items
that are found by the Court to be fixtures.

MEMORANDUM OF DECISION - 8

and he left things so they could be reconnected.

The testimony also differed sharply as to the wiring connections involved with a 150 KW generator that sat on an external concrete slab and provided back-up power to the residence's extensive electrical systems. Martin testified the generator cables were "cut" and left exposed. Flowers stated this damage had to have occurred at the time of the generator's removal because, if it occurred previously, the damage was such that the unit would have "shorted." Haynie testified the wiring was cut or "severed" in such a way as to render it unusable, and that significant cost would be incurred to reinstall that generator or a replacement because the concrete pad would have to be torn up, the remaining wiring pulled out, and the area re-wired from scratch.

However, Hodan explained the wiring was not severed but was in the same condition as it always had been. Hodan, who actually disconnected the generator, testified how the exposed portion of the copper wiring above the sheathing[18] was connected to the generator by cables terminating in "lugs." The lugs were then tightened down around the copper wiring with an Allen wrench. When he loosened the lugs, the connections were simply uncoupled. The wiring is in its original condition, and will allow reinstallation of a generator coupled in the same way, a process Hodan said he could complete in about an hour. The Court finds Hodan's testimony on this subject credible and competent and entitled to greater

---

[18] *See* Ex. 253 at 50.

MEMORANDUM OF DECISION - 9

weight than that of Flowers and Haynie.

On the whole, Anaconda's position limning a malicious and damaging destruction of the real property as fixtures and personal property were removed was not persuasively supported. There is little doubt that Debtor caused the removal of as much property as could arguably be proper, and seemed determined to leave as little as could be legally and reasonably justified,[19] but that this was accompanied with an intent to harm or damage the residence and other improvements on the real property was not proven.[20]

The Request raises a fundamental issue: whether each particular item is a fixture or instead is movable (and thus *re*movable) personal property. Evidence about the manner in which Debtor removed certain items, or about what animated his decision to remove some items and not others, is of value to the Court only in considering Debtor's credibility or evaluating the "intent" of Debtor required under Idaho law that an item of personal property be made a permanent accession to the property.[21]

---

[19]  Debtor concedes that errors were made and some property, such as the recessed can lighting, should not have been removed. Testimony indicates these particular items were returned, and Martin acknowledged their return.

[20]  While there was some damage to ceiling or wall areas incidental to speaker and lighting removal, *see, e.g.*, Ex. 253 at 36, 37, 42 and 43, this is capable of being addressed through the relief granted on the Request, *infra*.

[21]  To be clear, the Court has had the opportunity to observe all witnesses through two days of extensive—and often repetitive—testimony. It has evaluated the credibility of all witnesses, not just Debtor, and has evaluated the weight to be given each witness' testimony. That is true even where not highlighted in this Decision.

MEMORANDUM OF DECISION - 10

## II.    DISCUSSION AND DISPOSITION[22]

### A.    Relevant authorities

While § 541 addresses what becomes property of the estate, the Court looks to state law to determine the nature and extent of the debtor's, and thus the estate's, interest in property as of the commencement of the case. *Butner v. United States*, 440 U.S. 48 (1979); *McCarthy, Johnson & Miller v. N. Bay Plumbing, Inc. (In re Pettit)*, 217 F.3d 1072, 1078 (9th Cir. 2000) ("bankruptcy courts must look to state law to determine whether and to what extent the debtor has any legal or equitable interests in property as of the commencement of the case"); *Hopkins v. Frazier (In re Tews)*, 502 B.R. 566, 569 (Bankr. D. Idaho 2013); *In re Thompson*, 454 B.R. 486, 491–92 (Bankr. D. Idaho 2011).

Whether an item is a fixture is a mixed question of law and fact. *See Rayl*, 700 P.2d at 570. To determine whether an item is a fixture, the Court is to apply a three-part test evaluating (1) the annexation of the item to the realty, either actual or constructive,[23] (2) the adaptation or application of the item to the use or purpose to that part of the realty to which it is connected is appropriated, and (3) the intention to make the article a permanent accession to the freehold. *Id.* at 570–71.

---

[22]  For ease of exposition, certain of the factual findings are discussed in this portion of the Decision rather than in Part I.

[23]  "Constructive" annexation can be found where the object, though not itself attached to the realty, comprises a necessary, integral or working part of some other object which is attached. *Id.* at 571.

Of these elements, intention is the most significant, and the other two assist the

fact finder in addressing intent.  Intent is objectively evaluated by the

circumstances surrounding the disputed item's installation.  *Id.* at 571.  *See also In

re Merrick*, 151 B.R. 260, 261 (Bankr. D. Idaho 1993) (applying *Rayl*).

### B.    Determination of items constituting fixtures

The Court applies *Rayl* and the related authorities[24] to the evidence

presented, and reaches the following findings and conclusions as to the

characterization of the disputed items as fixtures.[25]

### 1.    Lighting

Debtor conceded the impropriety of removing the recessed "can" lights, and

testimony indicated he has returned those items.  They are fixtures.  Similarly, the

installed in-cabinet lighting, the wall sconces, and installed indirect lighting are

also fixtures.  Further, the installed lights on the grounds (for example, the

---

[24]  *Rayl*'s articulation of the fixture test flows from its analysis of the decisions in several prior Idaho cases including *Prudente v. Nechanicky*, 367 P.2d 568 (Idaho 1961), and *Boise-Payette Lumber Co. v. McCornick*, 186 P. 252 (Idaho 1919).  *Rayl* was also considered and applied in *Everitt v. Higgins*, 838 P.2d 311 (Idaho Ct. App. 1992), a decision quoted by this Court in *Merrick, supra*.  The Court has also considered as instructive the unpublished opinion of the Idaho Court of Appeals in *Rencher v. Brown*, 2011 WL 11048160 (Idaho Ct. App. Oct. 14, 2011).

[25]  Debtor argues there is a threshold issue of burden of proof, and contends such burden lies on Anaconda.  Anaconda's briefing and argument did not respond to Debtor's contentions regarding burden.  In one sense, the Request is brought in lieu of an action under Rule 7001(1) or (2) in which Anaconda as a "plaintiff" would bear the burden.  Given the manner in which the issues were raised and tried, the Court deems the burden of proof and, ultimately, of persuasion is on Anaconda.  *Accord, Rencher v. Brown*, 2011 WL 11048160 at *5 (noting that Rencher "bears the burden of showing the tank was a fixture").  That being said, the burden is a simple preponderance of the evidence.

MEMORANDUM OF DECISION - 12

"carriage lights" along the driveway discussed by Martin in his testimony) also satisfy the test for fixtures.[26]  However, beyond these several types of lighting, the evidence as to how any other lights were "mounted" or "installed" is too scant to support a finding they were fixtures.

Therefore, the Court concludes the suspended or hanging lighting—including the large chandeliers—are not fixtures.  These hanging lights were suspended by chains—albeit some by substantial chains—from the ceiling. Though so "installed," there was inadequate proof to establish the required intention that they be permanent accessions.  The specific hanging light in a room is often, and was here, a matter of personal taste, whether considering the smaller hanging or suspended lighting fixtures (*e.g.*, over a dining, game or pool table) or the large chandeliers.  Such lighting is generally removable and replaceable.[27] They could be and were removed professionally, and without damage to the realty, and are unlike the lighting that was placed into the ceilings (*i.e.*, recessed can lights) or walls.  On the weight of the evidence, the Court finds all hanging lighting to be removable personal property rather than fixtures, and the Request

---

[26]  Debtor will be responsible for the reasonable costs of reinstallation of the fixture lighting.  That amount cannot be determined on the present evidence.  Exhibit 257 (summarizing alleged charges Martin paid to Flowers) was denied admission for failure to meet the requirements of Fed. R. Evid. 106.

[27]  The largest chandelier required two men using mechanical lifts and a man lift to remove.  Ex. 260.  But the size and weight of the lighting was not shown to be a material factor requiring a different conclusion as to its status as a "fixture."  And Flowers' conceded on cross-examination that there was no damage by reason of their removal.

MEMORANDUM OF DECISION - 13

will be denied as to the same.[28]

### 2.      Appliances

#### a.      La Cornue stove

The 65" La Cornue gas range was a non-standard size appliance.  It was a wedding present from Debtor to his wife, and was acquired at the La Cornue factory in France.  The stove was free-standing on its "legs" and simply connected to a natural gas line and electric outlets.  And it was removed without damage.  Both of these factors were repeatedly emphasized by Debtor.  However, the kitchen area was custom-designed around the stove's non-standard dimensions, including cabinetry, tiling, and an exhaust hood.[29]

The La Cornue stove was "installed" in a manner that speaks objectively to the intent that it be a permanent accession.  It is found to be a fixture.

#### b.      Other appliances

There was little helpful testimony or documentary evidence as to the other itemized gas and electric stoves and ranges, and microwave ovens, located in the residence, guest house and caretaker house.  They are found not to be fixtures.

The listed Miele espresso maker, along with other Miele appliances such as

---

[28]   Some testimony indicated the turret chandelier or some portion thereof was returned, but this does not vary the Court's finding that it is not a fixture.

[29]   Ex. 251 at 16 (in situ); Ex. 253 at 28 (space upon removal); Ex. 124. The hood that came with the stove was left in the residence when the stove was removed.

MEMORANDUM OF DECISION - 14

steam or warming ovens, and warming drawers,[30] were apparently "housed" in a large cabinet in the main kitchen.[31]  That cabinet could be used for any number of appliances, or otherwise, and there is insufficient evidence of incorporation of the appliances into the structure or other intent that they be permanent fixtures.[32]

The Sub Zero freezer had a wood fascia panel that matched the kitchen cabinetry.[33]  Beyond that detail, the Court was not provided any evidence regarding the freezer, including whether it had non-standard dimensions, whether the kitchen was constructed to fit the freezer, whether other freezers would fit into that space.  The paneling, without more, does not preponderate in favor of finding the Sub Zero freezer was intended to be a fixture.

Similarly, the various washers and dryers in the residence, the caretaker house and the apartment over the garage are, on the weight of the evidence, not fixtures but, rather, movable appliances.[34]

---

[30]  *See* Exs. 129–133.

[31]  *See* Ex. 253 at 30.

[32]  Regarding these items, and others of similar nature, the fact that the Flowers' letter, Ex. 252, characterizes them by brand and as "built-in" is not determinative.  Flowers admitted on cross-examination that he had never been in the house prior to the items' removal, and had not seen the Miele appliances.  His description, therefore, of the brand or manufacturer of given items has no direct foundation.  The Court has relied on the photographs of the items and of the areas where they were located, and on witness testimony (or lack thereof), in order to evaluate the manner of "installation" and its import under the Idaho case law.

[33]  Ex. 253 at 29.

[34]  *See* Exs. 126–127; Ex. 253 at 24, 33, 39.

MEMORANDUM OF DECISION - 15

### 3.    Electronics

#### a.    Sound system

Debtor created a complicated, multi-function system that was extensively integrated throughout the residence.  It allowed for satellite tv and radio signals to be delivered independently to rooms throughout the structure, with each room's occupant capable of determining what media source to access.  This system also included an extensive intercom.  For functional and esthetic reasons, all the infrastructure is within the walls of the house.  The Court finds that the in-wall speakers, wiring and infrastructure for this entire system constitutes fixtures.

#### b.    "All electronics"

The Request generally refers to "all electronics."  The Court concludes that discrete items of electronic and A/V equipment—for example an amplifier, a satellite tv or a radio receiver, or a CD or DVD player—which are simply plugged into the system in the main control room or elsewhere and which could be and were easily detached (unplugged), are removable personal property and not fixtures.  That they were useful to and used in connection with the portions of the sound "system" which has been found to be a fixture has been considered but is neither determinative nor persuasive.  Any number of components could be purchased and used in connection with the installed wiring and speakers, and could be easily replaced or upgraded.   Additionally, the flat panel tv monitors that were hung in various rooms on brackets and removed are items potentially included

MEMORANDUM OF DECISION - 16

within the asserted category of "all electronics."  Though not specifically

addressed in the Request, they are also found to be moveable personal property

and not fixtures.

Some of the "electronics" relate to the security system in the house.  Those

items of equipment and the security system as a whole were not specifically

identified in Flowers' letter, but were discussed by witnesses.  There were security

cameras, particularly outside the residence,[35] and the same were connected through

a wiring system to digital video recorders (DVRs) in the "control room." While

Haynie testified that the security system would not work without DVRs, the

suggestion that these particular DVRs were essential and unique was not

persuasive.  Like receivers for satellite tv or radio (*i.e.*, non-fixture personal

property) connected into the residence's wiring system, the DVRs and related

computer equipment are found to be personal property even though plugged into a

wired security system and even though security cameras may have been left on

site.

### 4.    Standby generators

There was one large 150KW generator, and two smaller 20KW generators,

designed to provide back-up power in case of emergency.  These generators were

of importance given the overall design and sophistication of the residence and its

several systems (security, sound, lighting, heating) that required constant and

---

[35]  *See* Ex. 253 at 48.

MEMORANDUM OF DECISION - 17

reliable power.

The larger generator weighed up to 1500 pounds[36] and was placed on a concrete slab.  This generator was not bolted down or otherwise attached to the slab.[37]  It had no need to be given its weight.  When it was removed, a small tree was sawed down in order for the generator to be lifted and moved away.[38]

Debtor emphasized the mobility of the unit, even though it would take several men, and potentially a mechanical hoist, in order to move it.  Anaconda in turn emphasized not just the generator's size and weight, but its direct function, which was to provide back-up power to the property, as the various systems Debtor had installed required uninterrupted power.  But Debtor rejoins that, if Martin has similar desires for back-up power, he can purchase and install a generator, and the slab and intact wiring is there to facilitate it.

In *Boise-Payette Lumber Co.*, the Idaho Supreme Court considered machinery located in a lumber planing mill and concluded the machinery was not specially constructed for the building and could be bought on the general market, and that even though the machinery rested on a constructed foundation (there wood instead of concrete as here), this was not a determinative factor.  "[T]hough

---

[36]  Testimony varies, and was ultimately inconclusive, as to this generator's precise weight.

[37]  Ex. 253 at 50.

[38]  Ex. 253 at 51.  Testimony suggested the tree was about 6' high and had a 5" diameter trunk.  Anaconda's written and oral arguments overstate the significance of having to "cut down a moderately sized pine . . . tree in order to get the generator off the slab."  Doc. No. 195 at 5.

MEMORANDUM OF DECISION - 18

heavy, [the machines] could be moved without injury to the building, and were equally adapted for use elsewhere.  The mere fact that they were adapted to be used in this factory, and that they were necessary to carry on the business, is not enough of itself to impress on them the character of realty."  186 P. at 252.

In *Rencher v. Brown*, Rencher and her LLC purchased a 5 acre parcel from Brown.  During negotiations, the parties discussed how a 5,000 gallon fuel tank, sitting outside a shop building on the property and connected to a power source within that building by a 1" underground conduit, would be of use to Rencher's business.  After closing, a third individual came to pick up the tank, indicating that Brown had sold it at an auction.  When Rencher refused to surrender the fuel tank, the third party sued both Rencher and Brown, and Rencher cross-claimed against Brown contending the tank was a fixture that passed to her in the sale of the realty. The district court disagreed, noting, among other things, that the tank was at best merely connected to the outbuilding by power, and there was no evidence that some fixture on the property was rendered inoperable by the tank's removal.  2011 WL 11048160 at *3.  The Court of Appeals agreed it was not a fixture: "Instances where Idaho courts have concluded underground installations have rendered objects as 'fixtures' have included a significantly larger, more involved underground presence requiring significant damage to the land to effect removal. Here it is evident that a few snips of the wire disassociated the tank from the land

MEMORANDUM OF DECISION - 19

with virtually no damage to the realty." *Id.* at *4.[39]

*Rencher* distinguished its situation from that in *Rayl*. There an irrigation system was found constructive or actually annexed. It was bolted to cement slabs buried in the ground, and attached to pipes and electrical wires which were buried three to four feet underground. Not only did this new system fully replace a gravity irrigation system (that was deconstructed when the new one was installed), the removal of the new system would necessitate substantial digging and damage to the real property. *Id.*

The generator could be and was removed without damage to the realty.[40] It rested upon, but was not otherwise affixed to the concrete slab, which remains on the real estate and on which a replacement generator could easily be placed. The wiring, as established by Hodan, is amenable to reconnection to a generator with appropriate cabling and lugs, in a process that would take but an hour. Under the *Rayl* test, and given the guidance of *Boise-Payette Lumber* and *Rencher*, this generator is not a fixture.[41]

---

[39]   The decision also addressed Rencher's argument that the wiring was "cut" rather than just unplugged. It said: "[T]o the extent Rencher implies that [this fact] affects the character of the tank itself, we do not agree. In this sense, she appears to focus on the injury to the cord itself, while the case law in determining whether an item is a fixture focuses on whether removal causes injury to the real property." *Id.* The court continued by noting that the conduit was not destroyed but remained on the land, and that the removal of the tank was accomplished simply by lifting it and removal did not cause injury to the land or any structure on the land. *Id.*

[40]   The Court deems the loss of the small pine tree *de minimis* and, in the overall context here, inconsequential.

[41]   The Court is sensitive to Anaconda's implicit argument that the *Rayl* test's element of "adaption" is established because of the utility of the generator for reliable back-up power. As

(continued...)

MEMORANDUM OF DECISION - 20

There was little evidence as to the two smaller generators. It appears they were more portable or movable than the larger unit. No evidence suggests any more extensive installation or integration of these units than that of the 150KW generator which has previously been addressed.[42] These two smaller generators are also personal property, not fixtures.[43]

### 5.    Plumbing

The item identified as a "pedestal sink" in the Request is actually a 48" x 24" x 32" free-standing vanity cabinet on which a sink or basin made of petrified wood was later placed.[44] Samuel Kennedy testified that the vanity was a standard and readily-available "Old Hickory" piece of furniture.[45] The basin was an

---

[41] (...continued)

*Rencher* notes, the adaptation element "frequently focuses on whether the real property is particularly valuable in use because of the continued presence of the annexed property" and that an object may be a fixture where "it is a necessary, or at least a useful, adjunct to the realty, considering the purposes to which the realty is devoted." *Id.* (citing *Everitt*). But, as held in *Rencher*, for an object to become a fixture and, thus, part of the realty, all "three essential elements [—annexation, adaption, and intention—] must concur." *Id.* at *3. The district court in *Rencher* found a question of fact as to the fuel tank being a "useful adjunct," and the Court of Appeals found it unnecessary to review the finding on this prong of the test. *Id.* at *5. "[B]ecause all three elements must be met to classify an item as a fixture," and because the other elements were not proven, the district court's conclusion that the tank was not a fixture was affirmed. *Id.* at *6. So, too, here.

[42] *See* Ex. 253 at 52.

[43] There was evidence as to certain portable "Cadet heaters" located in the garage. These items were not separately mentioned in the Request or Ex. 252, but were noted in Doc. No. 174-1 as disputed items. However, there was no evidence that these units were installed or utilized in a manner that indicated the three-part test for a fixture was satisfied. To the contrary, these appear to be easily removable heating units, suspended by brackets on the garage wall. *See* Ex. 128, Ex. 253 at 51 They are personal property, not fixtures.

[44] Ex. 251 at 17 (in situ).

[45] Ex. 123.

MEMORANDUM OF DECISION - 21

addition Debtor selected with the assistance of an interior designer.  The cabinet is

a free-standing piece, supported on legs, and placed adjacent to the wall.  Holes

were drilled in the back of the cabinet through which the water and drain

connections were made.[46]  It was removed without damage to the wall in the

powder room in which it was located.[47]  Unlike a sink inlaid in custom-installed

bath or powder room cabinetry, this piece of furniture is personal property and not

a fixture.

### 6.    Window coverings

Window coverings such as curtains and drapes are not generally, and are

not here shown to be, fixtures.  They can be and regularly are removable and

replaceable.

Debtor evidently returned some window coverings, which is within his

discretion.  No evidence was presented as to any unreturned window coverings,

and Anaconda has failed to show the same were fixtures.  Debtor will not be

required to return any window coverings not already returned.

### 7.    Garage and gate remotes and vacuum attachments

The remote control units for the gates and garage doors are small, portable,

and of little monetary consequence.  Similarly, the vacuum system hoses and

attachments were relatively minor items of little monetary consequence.  That

---

[46]  Ex. 123.

[47]  Ex. 253 at 23.

MEMORANDUM OF DECISION - 22

these items were removed in the first place, and that they became part of the litigation, speaks more to the parties' enmity than to anything else. Not surprising, there was very little evidence presented regarding these items. Essentially, the Court was informed that these items were missing and they were necessary for systems (garage doors and vacuums) that were attached to the property to function.

The annexation element of the test under the Idaho cases can be met by "constructive annexation" where objects, though not themselves attached to the realty "comprise a necessary, integral or working part of some other object which is attached." *Rayl*, 700 P.2d at 571. Clearly, the gate, garage doors and vacuum system are fixtures. The Court concludes the remotes that operate those fixtures and the accessories that allow the vacuum system to function are an integral part thereof and meet this definition. Adaptation and intention are also adequately suggested by the evidence as a whole. Thus, the remotes, openers and vacuum hoses and attachments will be returned or replaced by Debtor.

### 8.   Statues

Anaconda objects to Debtor's removal of certain statues. While a "full-size moose" and a "carved wooden eagle" were referenced, there was no evidence regarding the *Rayl* elements as to either. The Court finds the contention that these two statues are fixtures was unproven.

The real focus here was on two "monumental bronze" works by sculptor Lincoln Fox. One is named "Heaven Bound," and is a 96" x 76" x 34" limited

MEMORANDUM OF DECISION - 23

edition bronze.[48]  The other is named "A Father's Aim," and is a 54" x 45" x 40"

limited edition bronze.[49]  These statues were placed on large concrete pads in the

gardens outside the residence, but simply rested on those pads given their weight,

and were not bolted down or otherwise installed.[50]

    The Court finds and concludes all these disputed bronze statues are personal

and movable works of art, and are not fixtures.[51]

### 9.    Mirrors

    Anaconda's Request (though not Flowers' letter, Ex. 252) raises issues with

Debtor's removal of several large mirrors, variously characterized as "beveled

with rope border," "copper framed with rope border," "leather framed oval

Mercier," and "antique style Dutch woodchip."[52]  The photos[53] along with

testimony establish that while some are rather large, they are simply strung with

wire and hung on hooks as large paintings would be.  Anaconda did not

demonstrate that the removed mirrors were fixtures.

---

[48]  *See* Ex. 141; Ex. 251 at 14.

[49]  *See* Ex. 136.

[50]  *See* Ex. 253 at 48.

[51]  *Accord Everitt*, 838 P.2d at 314–16 (finding a non-functional and, thus, decorative
wood stove that rested on a brick pad or pedestal was not a fixture but a personal item that could
be removed without injury to the realty).

[52]  These are also "disputed items" listed in Doc. No. 174-1.

[53]  *See* Exs. 137–140.

MEMORANDUM OF DECISION - 24

### 10.    The dock

Debtor had a dock built for use in conjunction with this property.  It sat in Lake Coeur d'Alene directly adjacent to the residence.[54]  The dock drew much, if not most, of the litigants' attention in this contested matter.

The State of Idaho owns and controls the lake, and structures thereon such as docks are allowed only through an encroachment permit issued upon strict compliance with state law and regulation.[55]  James Brady, Resource Supervisor for the Idaho Department of Lands, testified regarding the process by which an owner of shoreline property can seek approval to build and maintain a dock.

On Lake Coeur d'Alene, a landowner may seek a permit for a 700 square foot dock.  If there are two adjacent lots in which two family members have interests, a "variance" for a 1,100 square foot dock servicing both lots may be sought.  Here, Debtor owned both parcels, but his son, Scott, had a "lease" as to one.[56]  Brady indicated this met Idaho requirements for a larger dock.

Brady testified that docks and dock permits are site-specific and appurtenant to the adjacent real estate.  The permit allowing encroachment into the lake is similar, in his view, to an easement.  If the ownership of the appurtenant land changes, the dock must be removed, or the new owner must qualify for an

---

[54]  *See* Ex. 143 at 2–4; Ex. 251 at 9; Ex. 256.

[55]  *See generally* Ex. 142.

[56]  Ex. 259 at 111–16.

MEMORANDUM OF DECISION - 25

assignment of the encroachment permit.[57]

The dock here is a floating structure of timber, wood composite, and other material.  It is movable and Debtor concedes that, when he vacated the property, he caused it to be moved.  It is presently in a nearby bay, with one end grounded on a beach, with ropes tethering it to trees on shore.

Prior to being moved, the dock was attached to pilings that had been driven into the lake bed.  *See* Ex. 253 at 49.  The pilings are the sole permanent structures; the dock was attached by steel hoops or cables to the pilings.[58]  The pilings are not on the property that was owned by Debtor and acquired by Anaconda, but are instead in the lake owned by the State.  The pilings' encroachment on the State's land is allowed only by reason of the permit process.

The dock, when it was attached to the pilings, was connected to the shore by a removable 4' x 20' gangway or ramp.  That ramp was then attached to the floating dock that was moored to the pillars.[59]

---

[57]  The Court notes the presence of a July 7, 2014, assignment of the encroachment permit to Martin and a Martin family trust.  *See* Ex. 258.  Mr. Brady's testimony suggests to the Court that these dual assignees may be designed to facilitate the "variance" of the larger dock related to adjacent parcels, similar to what Debtor and his son Scott accomplished with the original permit.  It was clear that IDL would like to do away with this exception but, so long as it exists, Mr. Brady felt Martin could utilize it just as Debtor had previously.  But the assignment of the permit does not resolve the issue of whether *the* dock formerly located there is a "fixture."  It merely gives Martin the ability to attach *a* dock, of the type and size specified in the permit, to the pilings.

[58]  Ryerson testified it took about 15 minutes to unhook the hoops when moving it.

[59]  The ramp was attached at the shoreward end of a 6' x 36' floating "approach" that was itself an integrated part of the constructed dock.  The two slips were located at the lakeward end of that approach.  *See* Ex. 259; Ex. 143 at 4 (aerial photo).

MEMORANDUM OF DECISION - 26

As with the 150 KW generator discussed earlier, application of *Boise-Payette Lumber*, *Rencher* and the other case law to these facts establishes the dock is not a fixture.  It was not permanently affixed to the property in question, it was removed without damage to the realty, and its utility (*i.e.*, "useful adjunct") and arguable adaptation is not alone sufficient to make it a fixture.

Also instructive is *Prudente v. Nechanicky*, 367 P.2d 568 (Idaho 1961).  In that case, there was a structure variously identified as a boathouse, float house or houseboat.  Once dilapidated, it was repaired and improved, and placed on logs so that it would float on water.  The owners of certain land purchased through tax deed asserted they had rights to this structure, as did the parties who repaired and improved it.[60]  The Idaho Supreme Court noted that cases involving a "steamboat wharf" on a river and a "ferry boat dock" on a river were distinguishable because the structures there were "*permanently attached to the land* and used in connection with the use of the land itself."  *Id.* at 571 (emphasis added).  But the "lack of permanency of attachment of the houseboat" was different.  The court noted that the houseboat floated, and did not rest on the land; that it was not permanently attached to the land and, when attached at all it was moored by cables; and that it was moveable and mobility shown by actual movement.  The court concluded that it was not, nor ever intended to be, permanently fixed or appurtenant to the land, either actually or constructively.  *Id.*

---

[60]  The facts related to the chain of transfers of the realty, and of the houseboat, were complicated.  *Id.* at 568–69.

MEMORANDUM OF DECISION - 27

The Court reaches the same conclusion on this record as to the dock. The dock was at no point erected upon real property owned by Debtor and subject to the deed of trust. It was custom built and then attached to pilings driven into the lake bed. The ability to place those pilings in the lake was solely due to the State granting an encroachment permit for that purpose. The dock was connected to the subject realty solely by an easily removable gangway or ramp.[61] The dock was moveable by design. It was, in fact, uncoupled from the pilings and moved. The removal of the dock caused no physical damage to the subject realty itself.

The dock at issue – like the machinery in *Boise-Payette Lumber* and the fuel tank in *Rencher* – was utile to the subject real property. But unlike in those two cases, the personal property here was not *on*, much less affixed or annexed to, the real property. And in all three of these cases, the removal of the personal property caused no physical harm to the realty.

If the State were to allow an owner like Debtor to construct an immovable dock permanently and physically affix it to his shoreline property—like a wharf or a pier—the analysis could well be different. But that is not the situation presented. The lack of physical annexation (actual or constructive), the impermanence of the right to have and use a dock,[62] and the mobility of the dock itself, all lead the Court

---

[61] The evidence also indicated that electrical power had been taken to the dock, apparently by cable resting on the lake bed. It was uncoupled in some fashion when the dock was moved. This additional connection to the subject realty does not support a different conclusion.

[62] Recall that the permit right is expressly conditional. The myriad conditions include some related to the continued holding of interests by both waterfront lot owners. *See* Ex. 259 at

(continued...)

MEMORANDUM OF DECISION - 28

to conclude that Anaconda has failed to meet its burden.

The dock is not a fixture.

### C.    Remedy

As to each removed item that is found to be a fixture,[63] the Court will order

the same to be returned to Anaconda if it has not already been returned.  If an item

cannot be returned, its value will be paid to Anaconda.  Such value will be

determined, if necessary, by a subsequent evidentiary hearing, since the evidence

presented in the two days' of hearing on the Request was not adequate for the

Court to reach appropriate findings of value.

Additionally, as to each removed item found to be a fixture and, thus,

improperly removed, Debtor will be required to pay the cost of repair and

reinstallation.  If the expense of repair or reinstallation has already been incurred

and paid, Debtor will be required to reimburse Anaconda the reasonable expense

associated with that repair and reinstallation.  As with the question of value of an

item that cannot be returned, any dispute over the allowable cost of repair or

---

[62] (...continued)
91–94.  Thus, if the second lot "ceases to be leased, the dock shall be reduced and shall not
exceed 700 square feet."  And, "In ten (10) years a new lease shall be provided to the Department
to maintain a valid permit."  *Id.* at 93.  Obviously, then, there might be a permitted right to *a*
dock, but not to *this* specific larger dock and not for an indefinite period, also belying the idea
that it is a fixture sufficiently attached to the realty.

[63]  For clarity, the fixtures are: recessed can lighting; installed in-cabinet lighting; wall
sconces; installed indirect lighting; carriage lights and similar grounds lighting; the La Cornue
stove; in-wall speakers, wiring and related system infrastructure; and garage and gate remotes and
vacuum attachments.

MEMORANDUM OF DECISION - 29

reinstallation is subject to further hearing.[64]

**CONCLUSION**

The Request will be granted, in part, as set forth above.  The Court will

enter its own form of order.

DATED:  September 30, 2014

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

------------------------------------

[64]  The parties may, of course, obviate the need for such hearing by agreeing to the amount and manner of payment of such items and expenses, and filing appropriate stipulations.

MEMORANDUM OF DECISION - 30